# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

v.                                                    CIVIL ACTION NO. 5:06-cv-00267

CHARLES E. GWINN, et al.,

                    Defendants.


### MEMORANDUM OPINION AND ORDER

Pending before the Court are: (1) Defendant Charles E. (Eric) Gwinn's Motion to Dismiss [Docket 102]; (2) Defendant David P. Murphy's Motion to Set Aside Entry of Default [Docket 112] and Motion to Dismiss [Docket 118];[1] (3) Defendant Charles E. (Charlie) Gwinn's Motion for Judgment on the Pleadings [Docket 119]; and (4) Defendant Thomas M. Binetti's Motion to Dismiss [Docket 121].[2]

---

[1] Murphy also filed a Motion to Exceed Page Limit for Memorandum of Law in Support of Motion to Dismiss [Docket 125]. There being no objection by the Government, Murphy's motion is **GRANTED**. However, after reading the memorandum, the Court notes that the arguments contained therein could have easily been articulated and developed in less than twenty pages. Additionally, Murphy filed a Motion for Leave to File Reply Brief Out of Time [Docket 133]. There also being no objection to this motion, it is **GRANTED**, and his reply will be considered timely.

[2] In addition to Defendants' motions, the Government filed motions for leave to file two surreplies and a supplemental response. For good cause shown, the Government's motions [Dockets 116, 136, & 164] are **GRANTED**. Accordingly, the Court **ORDERS** that those documents be filed. Additionally, the Government filed a Motion to Substitute Page One of Exhibit A to the Second Amended Complaint [Docket 130]. There being no objection to the Government's motion, it is also **GRANTED**.

For the reasons stated below, the Court grants Defendant Murphy's motion to set aside default, grants in part and denies in part the motions to dismiss of Defendants Eric Gwinn, Murphy, and Binetti, and grants in part and denies in part Defendant Charlie Gwinn's motion for judgment on the pleadings.

## I.  BACKGROUND

This action arises out of Defendants' operation of a Medicare durable medical equipment (DME) supply company called Group II Medical Supports LLC (Group II).  According to the Second Amended Complaint (Complaint), Group II was a West Virginia Limited Liability Company wholly owned and operated by Defendant Charlie Gwinn and Tracy Webber.  (Second Am. Compl. ¶¶ 2, 20.)  Defendants Eric Gwinn, David Murphy, and Thomas Binetti were employed by Group II as sales representatives.  (*Id.* ¶¶ 3-5.)

Group II specialized in the marketing and placement of DME, specifically Group II Support Surfaces (group II mattresses).  (*Id.* ¶ 26.)  This type of mattress is a specialized mattress used for the treatment of pressure ulcers, also known as decubitus ulcers, and is covered by Medicare if certain criteria are met.  (*Id.* ¶¶ 26-28, 35.)  A group II mattress is covered by Medicare if a beneficiary meets: (a) criteria 1 and 2 and 3; (b) criterion 4; or (c) criteria 5 and 6.  (*Id.* ¶ 35.)  The criteria are:

> 1. Multiple stage II pressure ulcers located on the trunk or pelvis;
>
> 2. Beneficiary has been on a comprehensive ulcer treatment program for at least the past month that has included the use of an appropriate group I support surface;
>
> 3. The ulcers have worsened or remained the same over the past month;
>
> 4. Large or multiple stage III or IV pressure ulcer(s) on the trunk or pelvis;

2

5.      Recent myocutaneous flap or skin graft for a pressure ulcer on the trunk or pelvis (surgery within the past 60 days); and

6.      The beneficiary has been on a group II or III support surface immediately prior to a recent discharge from a hospital or nursing facility (discharge within the past 30 days).

(*Id.*)

If these criteria are met, and as long as the healing process continues, Medicare covers use of a group II mattress until the pressure ulcer is healed.  (*Id.* ¶ 36.)  If these criteria are met, but healing does not continue, Medicare continues to cover the group II mattress if there are medical records to show that: (a) other aspects of the care plan are being modified to promote healing; or (b) the use of the group II mattress is medically necessary for wound management.  (*Id.* ¶ 37.)  Once the pressure ulcer is healed, Medicare no longer covers the group II mattress.  (*Id.* ¶ 38.)

In order to receive reimbursement for a group II mattress in compliance with Medicare regulations, certain documentation must be properly filled out.  (*Id.* ¶ 39.)  Medicare provides DME suppliers with a suggested form, entitled "Statement of Ordering Physician Group 2 Support Surfaces" (Medicare SOP), for the collection of information concerning which, if any, criteria the beneficiary meets.  (*Id.* ¶¶ 44-45.)  The Complaint alleges that the Medicare SOP contains six questions used to evaluate medical necessity and beneficiary eligibility for a group II mattress, which may only be answered by the treating physician or their staff or other health care professional, and not DME suppliers.  (*Id.* ¶¶ 46-47.)

The Government alleges that beginning in or about January of 1998, and continuing to sometime in April of 2004, Eric Gwinn, Murphy, and Binetti were employed by Group II, and conspired with one another, Charlie Gwinn, Tracy Webber, and other Group II employees to defraud

the United States through a scheme involving the placement of group II mattresses billed to Medicare for patients who did not meet the aforementioned criteria.

Allegedly, Defendants created false documents that included false diagnoses for pressure ulcers and other material misrepresentations. (*Id.* ¶ 96.) Defendants also allegedly falsified answers to questions regarding patients' medical conditions on Medicare SOPs -- forms that were required to be completed by a qualified health care provider -- and caused false claims to be submitted for the use of the mattresses, which resulted in significant losses to Medicare. (*Id.* ¶ 85-94.)

Furthermore, the Complaint alleges that Defendants developed and employed deceptive marketing practices, (*Id.* ¶ 67), and that Charlie Gwinn trained other Group II sales representatives on the marketing, placement and servicing of group II mattresses, and the completion of standardized Group II forms. (*Id.* ¶¶ 31, 32, 77.) The Government contends that Eric Gwinn, Binetti, and Murphy were compensated through commissions paid by Group II based upon the revenue generated for the mattresses that they placed or serviced. (*Id.* ¶ 30.)

Originally, the United States filed a complaint against only Charlie Gwinn.[3] Then, on January 18, 2007, the United States moved for leave to file its second amended complaint. This time, the Government sought to add claims against Eric Gwinn, Murphy, and Binetti. The Court granted leave, and on April 16, 2007, the Government filed the seven-count second amended complaint against Defendants.[4]

---

[3] The Government's original complaint against Charlie Gwinn was filed on April 7, 2006, and amended once on April 13, 2006.

[4] As a side note, on October 11, 2005, Group II pled guilty to a single-count information in this Court. *See United States v. Group II Med. Supports, LLC*, Criminal No. 5:05-0127. The information alleges that between January 1998, and February 2004, Group II made false statements in connection
(continued...)

Counts I-III of the Complaint are brought pursuant to the provisions of the False Claims Act, 31 U.S.C. §§ 3729-33.[5]  Count I alleges that Defendants "knowingly presented and caused to be presented . . . false or fraudulent claims for payment or approval by the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)."  (*Id.* ¶ 110.)  Count II asserts that Defendants "knowingly made, used, or caused to be made or used . . . a false record to get a false or fraudulent claim paid or approved by the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2)."  (*Id.* ¶ 115.)  In Count III, the Government contends that Defendants "conspired with each other and Tracy Webber and other Group II employees to defraud the United States by getting false or fraudulent claims allowed or paid by the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(3)."  (*Id.* ¶ 120.)  Count IV alleges a common law cause of action for unjust enrichment.  Count V alleges a "Payment by Mistake" claim, and Count VI states a common law cause of action for "Recovery of Monies Unlawfully Paid Contrary to Statute or Regulation."  Finally, Count VII asserts a "Constructive Trust" cause of action.

The Complaint includes the following specific allegations against Defendants (who are listed individually in each paragraph), Tracy Webber, and other Group II employees:

68.    [Defendants] targeted personal care homes (PCHs) where Medicare beneficiaries resided, to engage in the fraudulent marketing practices and place group II mattresses.

69.    [Defendants] falsely represented to PCH representatives and others that the group II mattresses were approved by Medicare at no cost to the facility and

---

[4](...continued)
with the delivery of payment for health care benefits, in violation of 18 U.S.C. § 1035(a)(2).

[5]  The introductory paragraph on the first page of the Complaint reads: "This action is brought against defendants . . . under the provisions of the False Claims Act, 31 U.S.C. §§ 3729-[]33 . . . ." (Second Am. Compl. at 1.)

no cost to the resident for the prevention of skin problems, including red or irritated skin, decubitus ulcers, pressure spots, bed sores, or "whatever they are called."

70.     [Defendants] knowingly withheld information from PCH representatives regarding Medicare coverage criteria for group II mattress placement and continued use, and Medicare documentation criteria.

71.     [Defendants] routinely marketed group II mattresses to PCH representatives knowing that beneficiaries did not have qualifying pressure ulcers and did not otherwise meet Medicare coverage criteria.

72.     [Defendants] created false patient information sheets on which they routinely included a diagnosis for two stage II decubitus ulcers without regard to medical evidence, documentation or other information to support such diagnosis and in many instances knowing the same to be false.

73.     [Defendants] created false "capped rental agreements" on which they misrepresented that Medicare would pay for the group II mattresses for 15 months of continuous use without regard to Medicare coverage criteria for continued use and without medical evidence, documentation or other information to support continued need.

74.     [Defendants] had the false capped rental agreements signed by PCH representatives prior to delivery of the group II mattress.

75.     [Defendants] included on the capped rental agreement, "See attached sheet for '10th month' rental/purchase option" when, oftentimes, no sheet was attached.

76.     [Defendants] created false [Medicare] SOPs by answering the six questions regarding medical necessity according to a standard formula and without regard to [the] individual beneficiary['s] condition.

77.     Tracy Webber, Charlie Gwinn, and other Group II employees trained Binetti, Murphy, Eric Gwinn, and other Group II employees to complete the [Medicare] SOPs as follows: "Information must be circled as follows: 1. Y; 2. Y; 3. 3[sic]; 4. N; 5. N; 6. N."

78.     [Defendants] routinely answered the six questions on the [Medicare] SOPs according to the standard formula without regard to the individual beneficiary's condition and without medical evidence, documentation or other information to support the answers.

6

79.   [Defendants] routinely answered the six questions on the [Medicare] SOP with the knowledge that the answers did not accurately reflect the individual beneficiary's condition.

80.   [Defendants] routinely answered the six questions on the [Medicare] SOP without input from wound care providers, treating physicians or other health care professionals.

81.   [Defendants] routinely obtained a "Signature of Information Supplier" on each [Medicare] SOP to make it appear that the answers to the six questions were provided by the signatory, when in fact, the signatories were not asked the questions and did not provide the answers.

83.   [Defendants] routinely completed the [Medicare] SOPs with knowledge and in direct violation of the Medicare prohibition against such completion.

85.   [Defendants] routinely presented the false or fraudulent [Medicare] SOPs to physicians for signature.

86.   [Defendants] often used a standard cover letter drafted by Group II to accompany the false or fraudulent SOPs.

87.   The physician cover letter contained false or misleading information regarding the completion of the [Medicare] SOP and physician responsibility in connection with the authorization of the group II mattress.

88.   The physician cover letter indicated that the group II mattress was requested by the "Supplier of Information" and that the "Supplier of Information" provided all of the applicable information when, in fact, the information was supplied entirely by [Defendants].

89.   The physician cover letter indicated that "all that is required for your approval for placement of this product is the doctor's signature, Medicare UPIN # and Date" when, in fact, the physician should have exercised independent medical judgment regarding medical necessity for the group II mattress.

90.   [Defendants] knew that physicians regularly signed the [Medicare] SOPs without adequate consideration and evaluation of beneficiary condition or Medicare coverage criteria.

94.   [Defendants] presented and caused the presentation of false or fraudulent claims by Group II to Medicare for the placement of group II mattresses knowing that the beneficiaries did not meet the Medicare coverage criteria.

7

95.     [Defendants] presented and caused the presentation of false or fraudulent claims to Medicare for the placement of group II mattresses knowing that they did not have the documentation on file required for use of the KX or ZX modifier.[6]

96.     [Defendants] created false documents in order to get false claims for continued use of group II mattresses reimbursed by Medicare.

97.     [Defendants] completed a false "Monthly Patient Information Update Sheet" (update sheet) for each group II mattress placed.

100.    [Defendants] completed the update sheets each month or upon each visit to a PCH in which a group II mattress had been placed.

101.    [Defendants] routinely wrote "yes" in the column regarding continued need, without regard to [the] individual beneficiary['s] condition and without regard to Medicare coverage criteria for continued use.

102.    [Defendants] routinely wrote "yes" in the column regarding continued need and wrote the name of the purported contact person at the PCH when, in fact, they had not inquired about [the] individual beneficiary['s ]condition.

103.    [Defendants] were aware of the Medicare coverage criteria for continued use and Medicare documentation requirements for continued need and routinely disregarded the same.

104.    [Defendants] presented and caused the presentation of false or fraudulent claims to Medicare for the continued use of group II mattresses knowing that the majority of beneficiaries did not meet the Medicare coverage criteria for continued use because they did not meet the Medicare coverage criteria for initial placement.

Additionally, attached to the Complaint as Exhibit A, is a document entitled "Redacted

Claims Summary Without Patient Names" that details approximately 1,900 claims submitted to the

---

[6] According to the Complaint, the KX or ZX modifier indicates that the supplier has the requisite Medicare documentation on file and can make it available to Medicare upon request.  (*See* Second Am. Compl. ¶ 62.)

Government.  The information contained in this exhibit includes: (1) the date of service; (2) billed amount; (3) allowed amount; (4) sum; (5) facility; and (6) whether the service was necessary.[7]

After the Government filed its Complaint, all defendants except for Murphy filed timely answers.  Following their answers, Eric Gwinn and Binetti each filed motions to dismiss, and Charlie Gwinn filed a motion for judgment on the pleadings.[8]  Defendants make essentially the same legal arguments in their motions.

When Murphy failed to file a timely answer by June 20, 2007, the Government filed an application for entry of default by the Clerk on June 26, 2007, which the Clerk entered on June 29, 2007.  Thereafter, on July 3, 2007, Murphy filed a motion to set aside entry of default, and then subsequently filed a motion to dismiss, where he adopted Eric Gwinn's motion to dismiss, and added a few of his own arguments.

Initially, all of the defendants argue that the Government improperly pled Counts I-III, which allege violations of the False Claims Act, because those claims were not brought pursuant to 31 U.S.C. § 3730.  Next, Defendants assert that the allegations contained in Counts I-III of the Complaint do not meet the specificity requirements of Fed. R. Civ. P. 9(b).  Third, Defendants contend that Count III should be dismissed because the intracorporate conspiracy doctrine precludes the Government from pursuing a conspiracy claim against them.  Fourth, Defendants argue that

---

[7]  The Government has also provided Defendants with an un-redacted supplemental exhibit that includes the beneficiaries' names.

[8]  When considering Charlie Gwinn's motion for judgment on the pleadings pursuant to Rule 12(c),the Court applies the same standard as when considering a motion to dismiss pursuant to Rule 12(b)(6).  *See Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002).

Counts I and II fail because the treating physician, and not Defendants, certified the need for the group II mattresses, and thus, Defendants did not "knowingly" submit false claims.[9]

Eric Gwinn,[10] Murphy, and Binetti also have arguments exclusive to them.  Eric Gwinn, Murphy, and Binetti argue that this Court lacks personal jurisdiction over them, and that this action should be dismissed as a result.  Alternatively, Murphy and Binetti argue that venue should be transferred to districts more convenient for them.[11]  Finally, Murphy also filed motions to sever due to misjoinder, to dismiss for failure to name Group II as a necessary and indispensable party, and to dismiss for improper venue.  Beginning with Murphy's motion to set aside default, the Court will address each motion in turn.

## II.  DISCUSSION

A.      *Murphy's Motion to Set Aside Default*

The docket reflects that Murphy was served with a summons and the Complaint on May 31, 2007.  His answer was therefore due by June 20, 2007.  (*See* Docket 99.)  When he did not answer by June 26, 2007, the Government filed an application for entry of default, which the Clerk entered on June 29, 2007.  Murphy then filed his answer on July 2, 2007, and his motion to set aside entry

---

[9]  Binetti was the only defendant who did not make this argument.

[10]   In his motion to dismiss, Eric Gwinn argues that the statute of limitations prohibits the Government from pursuing hundreds of claims contained in Exhibit A of the Complaint.  Eric Gwinn abandons this argument in his reply, but he reserves his right to make this argument again on summary judgment.  Accordingly, his motion to dismiss the claims based on the statute of limitations is **DENIED WITHOUT PREJUDICE**.

[11]  Binetti requests transfer to the Eastern District of Virginia, and Murphy asks for a transfer to the Eastern District of North Carolina.

10

of default on July 3.[12]  In his motion to set aside entry of default, Murphy states that before the Government filed its Complaint, his counsel had been in contact with the Government and discussed the matter in an ongoing dialogue to try to resolve the claims without court intervention. Apparently, his discussions continued after the Complaint was filed and until the day before the Government filed for entry of default.  Murphy states that the sides spoke via telephone on June 25, 2007, and, although his answer was late and had not yet been filed, the Government gave him no indication that an application for default would be forthcoming.

After the Government filed its application, Murphy's counsel, in an effort to prevent the unnecessary filing of a motion to set aside entry of default, immediately requested that the Government withdraw its application, and inform the Court of the parties' conversation.  Obviously, the Government declined and Murphy filed this motion.  In support of his motion, Murphy recites the conversations of the parties and includes, as an exhibit, a letter to the Government that details those interactions.

    *(1)    Standard*

Pursuant to Fed. R. Civ. P. 55(c), a court may, "for good cause shown," set aside an entry of default.  "The disposition of motions made under Rule[] 55(c) . . . is a matter which lies largely within the discretion of the trial judge . . . ."  *Consol. Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.*, 383 F.2d 249, 251 (4th Cir. 1967).  There are several factors a district court should consider in deciding whether to set aside an entry of  default.  These factors include: "whether the moving party has a meritorious defense, whether it acts with reasonable promptness, the personal

---

[12]  Murphy states that his answer would have been filed electronically on Friday June 29, 2007, but for computer related difficulty with the attempted electronic filing.

responsibility of the defaulting party, the prejudice to the [other] party, whether there is a history of dilatory action, and the availability of sanctions less drastic." *Payne v. Brake*, 439 F.3d 198, 204-05 (4th Cir. 2006). In weighing and evaluating these factors, the Court must consider the "extensive line of decisions that [hold] Rule [] 55(c) . . . [should] be liberally construed in order to provide relief from the onerous consequences of defaults and default judgments." *Tolson v. Hodge*, 411 F.2d 123, 130 (4th Cir. 1969). Accordingly, "[a]ny doubts about whether relief should be granted should be resolved in favor of setting aside the default so that the case may be heard on the merits." *Id.*

(2)    *Analysis*

Importantly, the defense need not be *proven* at this stage in order for it to be "meritorious" for purposes of the Court's analysis. *Wainwright's Vacations, LLC v. Pan Am. Airways, Corp.*, 130 F. Supp. 2d 712, 718 (D. Md. 2001) ("[T]he moving party does not have to prove conclusively that he would prevail, only that there is sufficient evidence to permit a court to find in his favor."); *cf. Md. Nat'l Bank v. M/V Tanicorp I*, 796 F. Supp. 188, 190 (D. Md. 1992) ("The mere assertion of a meritorious defense is not enough, Defendant must state the underlying facts to support the defense."). In fact, even if a defense is tenuous, then the "meritorious defense" factor should weigh in favor of granting a motion to set aside entry of default. *See Rasmussen v. Am. Nat'l Red Cross*, 155 F.R.D. 549, 552 (S.D. W. Va. 1994) (Haden, J.) ("Although the Court finds the Defendant's 'meritorious defense' argument tenuous, it nonetheless recognizes the general policy of deciding cases on their merits."). "[A]ll that is necessary to establish the existence of a 'meritorious defense' is a presentation or proffer of evidence, which, if believed, would permit either the Court or the jury to find for the defaulting party." *United States v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982).

12

Murphy mentions in his conversations with the Government that because he was not an officer, director, or shareholder of Group II, he is not liable for the allegations contained in the Complaint.  Unfortunately for Murphy, this is not a meritorious defense because the False Claims Act does not require an individual to be an officer, director, or shareholder in order to be held liable.  *See* 31 U.S.C. § 3729(a) (imposing liability on "any person" who violates the statute).  However, in his motion to dismiss, filed after this motion to set aside entry of default, Murphy sets forth a meritorious defense to Count III -- the intracorporate conspiracy doctrine, which is discussed in detail *infra*.  Moreover, as noted by Eric Gwinn in his motion to dismiss, many claims may be barred by the statute of limitations.  Thus, there appear to exist meritorious defenses to some of the Government's claims and this factor weighs heavily in favor of setting aside entry of default.

Next, considering whether Murphy acted with reasonable promptness, the Court **FINDS** that he moved quickly in filing both his answer and a motion to set aside entry of default.  His motion was filed a mere six days after the Clerk entered default.[13]  Other courts have held that responses given within similar time frames were reasonably prompt.  *See Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir. 1988) (two weeks); *Park Corp. v. Lexington Ins. Co.*, 812 F.2d 894, 896 (4th Cir. 1987) (fifteen days); *Colleton Preparatory Acad., Inc. v. Beazer E. Inc.,* 223 F.R.D. 401, 406 (D.S.C. 2004) (nine days); *Bank United v. Hamlett*, 286 B.R. 839, 843 (W.D. Va. 2002) (nineteen days); *Rasmussen*, 155 F.R.D. at 551 (three days).

Further, there is neither a history of dilatory actions by Murphy, nor will the brief delay in any way prejudice the Government.  Murphy filed his answer almost immediately after the

---

[13] Although the Court finds that Murphy's response was reasonably prompt, the Court notes that it in no way condones counsel's chosen course of conduct.  There are certain deadlines in civil litigation that should not, under any circumstances, be missed.  Filing an answer is one of them.

Government filed its application, and only twelve days after it was due.  Additionally, because this case is proceeding against the other defendants, the Government will not be prejudiced by setting aside the entry of default.

Moreover, the Government had been in contact with Murphy's counsel the day before it filed its motion for entry of default.  Thus, because of the communications the Government had with Murphy's counsel over the disputed issues, it knew that he sought an amicable resolution to the case, and if one was not available, then an answer and defense should be expected.[14]  As such, the fact that the Government will suffer no prejudice also weighs in favor of setting aside the entry of default.

Courts applying these factors have placed the greatest weight on determining whether the defaulting party or its counsel bears the responsibility for the delay.  *See Palmetto Fed. Sav. Bank v. Indus. Valley Title Ins. Co.*, 756 F. Supp. 925, 932 (D.S.C. 1991), *vac. by agreement of parties*, 1991 U.S. Dist. LEXIS 21831 (D.S.C. May 15, 1991) (listing cases).  While there may have been some degree of personal responsibility on behalf of Murphy for not contacting and working with his counsel, the primary delay seemed to be caused by Murphy's counsel thinking that a resolution with the Government, and without court intervention, was a possibility.  This is apparent because of the relatively short time frame in which the answer was filed following the entry of default. Thus, the Court **FINDS** that there is little degree of personal responsibility on behalf of Murphy, and this factor accordingly weighs in favor of setting aside default.  *See Moradi*, 673 F.2d at 728 ("justice also demands that a blameless party not be disadvantaged by the errors or neglect of his attorney

---

[14]  The Court does not look with favor upon the fact that the Government had been in settlement discussions with Murphy and apparently led him to believe that resolution of this case was possible, but then subsequently filed a motion for entry of default without discussing that course of action with him.  This behavior on the part of the Government is unnecessary in the pursuit of justice and falls short of this Court's notion of civility and collegiality in the practice of law.

which cause a final, involuntary termination of proceedings").  Additionally, the record does not reflect that the delay was a result of bad faith.

Finally, other less drastic sanctions seem to be available, specifically, the availability of the Court's power to award the Government fees associated with bringing the motion for entry of default.  *Belvac Prod. Mach., Inc. v. Std. Indus. Prods. Co.*, No. 6:06-00034, 2007 U.S. Dist. LEXIS 29812, at *8-9 (W.D. Va. Apr. 23, 2007) (unpublished) ("Finally, there appear to be less drastic sanctions available: [the parties] have agreed that [the third-party defendant] will reimburse [the third-party plaintiff] for the latter's fees and costs associated with filing the motion for default and with the original discovery plan."); *see also Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951, 954 (4th Cir. 1987) ("The attorney, for example, could have been charged with all costs and expenses attendant to the delay, including attorneys' fees, or even held in contempt of court.").  Regardless of its availability, however, the Court declines to exercise its discretion in awarding fees because had the Government informed Murphy's counsel of its intent to file the motion for entry of default, Murphy's motion, the Government's response, and this discussion would have likely been avoided. While the Government is technically correct in its assertion that it is "unaware" of any "obligation to advise [defense] counsel of its intention to seek default[,]" such a notice would have likely caused Murphy to file an answer immediately, thereby facilitating the litigation in this case.

Therefore, given the applicable factors, including the possibility of meritorious defenses, the fact that there will be no prejudice to the United States, and the policy of deciding cases on the merits, the Court **FINDS** that good cause exists to set aside the entry of default.  Accordingly, Murphy's motion to set aside entry of default by the Clerk is **GRANTED**.

**B.**     *Defendants' Motions to Dismiss Counts I-III for Failing to Bring Those Counts Under 31 U.S.C. § 3730*

Defendants argue that the United States improperly pled Counts I-III because those counts were brought under 31 U.S.C. § 3729, and not under 31 U.S.C. § 3730.  Their argument is based on the fact that under each count in the Complaint, the Government states: "This is a claim under the False Claims Act, 31 U.S.C. §§ 3729(a)(1) [, (a)(2), (a)(3)], as amended."  (*See* Second Am. Compl. ¶¶ 108, 113, 118.)  Defendants contend that because the Government failed to cite 28 U.S.C. § 3730 specifically, Counts I-III should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

*(1)     Applicable Law*

Pursuant to Fed. R. Civ. P. 8(a), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "[U]nder the liberal standards of the Federal Rules of Civil Procedure . . . a plaintiff 'must at least set forth enough details so as to provide defendant and the court with a fair idea of the basis of the complaint and the legal grounds claimed for recovery.'" *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998) (quoting *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 466 (9th Cir. 1990)). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1964-65 (2007).  The plaintiff is required to allege sufficient facts, which, if proven, would entitle him to relief.  Fed. R. Civ. P. 8(a).

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the complaint, and the factual allegations must be taken as true and construed in the light most favorable to the plaintiff.  *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994).  Consequently, a motion to dismiss should be granted only if, after accepting all well-pleaded allegations contained

16

in the complaint as true, the plaintiff fails to allege enough facts to state a cognizable legal claim that is plausible on its face. *Twombly*, 127 S. Ct. at 1974. "Factual allegations must be enough to raise a right to relief above the speculative level," and if a plaintiff does not "nudge" his claim "across the line from conceivable to plausible," then the complaint should be dismissed. *Id.* at 1965, 1974.

Under the Federal Rules, a plaintiff is not required to plead a legal theory. *Vidimos, Inc. v. Laser Lab*, 99 F.3d 217, 222 (7th Cir. 1996) ("The Federal Rules of Civil Procedure do not require a plaintiff to plead legal theories."). He must merely give the defendant and the court a fair idea of the legal grounds claimed for recovery. *Karpel*, 134 F.3d at 1227. "[M]any federal courts have held that a complaint is sufficient against a motion to dismiss under Rule 12(b)(6), if it appears from the complaint that the plaintiff may be entitled to any form of relief, even though the particular relief he has demanded and the theory on which he seems to rely are not appropriate." 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1219 (3d ed. 2007).

(2)    *Analysis*

Defendants provide no law in support of their argument that failure to cite § 3730 under each cause of action is fatal to that count. Accordingly, the Court rejects this argument. Further, contrary to Defendants' position, the United States does in fact bring its claims against them under § 3730. The introductory paragraph of the Complaint specifically states that the action is brought "under the provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733[,]" which includes § 3730. (Second Am. Compl. at 1.)

Additionally, even if the Court accepts Defendants' argument that Counts I-III were not brought under § 3730, the Complaint does not fail as a matter of law because all that must be pled are enough factual allegations to show that the plaintiff is entitled to relief. *See Twombly*, 127 S.

17

Ct. at 1974.  The Court is unaware of any rule of law which requires a plaintiff to list specific statutes under each count in a complaint.

Moreover, any argument that Counts I-III should be dismissed for lack of subject matter jurisdiction because § 3730 is not listed under each count of the Complaint is without merit.  "If facts giving the court jurisdiction are set forth in the complaint, the provision conferring jurisdiction need not be specifically pleaded.  After all, 'It is well settled that the recitation of a statute can neither deprive a court of jurisdiction nor confer jurisdiction upon it.'"  *Blue v. Craig*, 505 F.2d 830, 844 (4th Cir. 1974) (citations and footnote omitted).  The Complaint clearly allows the Court to ascertain its jurisdictional basis.[15]

For these reasons, the Court rejects Defendants' argument, and their motions to dismiss Counts I-III for failure to plead under § 3730 are **DENIED**.

C.     *Defendants' Motions to Dismiss Counts I-III Pursuant to Fed. R. Civ. P. 9(b)*

(1)     *Applicable Law*

Rule 9(b) of the Federal Rules of Civil Procedure requires that the circumstances constituting fraud be stated with particularity.  The Fourth Circuit has held that this standard is met when "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby[]" are set forth in a complaint.  *Harrison v. Westinghouse Savannah River Co.* (*Harrison I*), 176 F.3d 776, 784 (4th Cir. 1999) (internal

---

[15]  Even if the Government did not properly plead Counts I-III, Defendants' motion to dismiss on this ground would be denied because dismissal is not the appropriate remedy.  Under Fed. R. Civ. P. 15(a), the United States would be permitted to amend its complaint to correct any minor error.

quotation marks and citation omitted).  Conclusory allegations will not satisfy the particularity

requirement. *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989).

In cases where there are multiple defendants,"[a] complaint fails to meet the particularity

requirements of Rule 9(b) when a plaintiff asserts merely conclusory allegations of fraud against

multiple defendants without identifying each individual defendant's participation in the alleged

fraud." *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D. Md. 2000) (citing *Wang Labs., Inc.

v. Burts*, 612 F. Supp. 441, 445 (D. Md. 1984); *Wiener v. Napoli*, 760 F. Supp. 278, 284 (E.D.N.Y.

1991) (holding that where "multiple defendants are involved in the alleged fraud, it is especially

important that the fraud be particularized as to each one of them[]")).

Importantly, "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court

is satisfied (1) that the defendant has been made aware of the particular circumstances for which she

will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence

of those facts." *Harrison I*, 176 F.3d at 784.  "The most basic consideration in making a judgment

as to the sufficiency of a pleading is the determination of how much detail is necessary to give

adequate notice to an adverse party and enable him to prepare a responsive pleading." *Nat'l Mort'g

Warehouse, LLC v. Trikeriotis*, 201 F. Supp. 2d 499, 505 (D. Md. 2002) (internal quotation marks

and citations omitted).  As the Fourth Circuit explained in *Harrison I*, Rule 9(b) has four purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a
> defense by putting it on notice of the conduct complained of . . . .  Second, Rule 9(b)
> exists to protect defendants from frivolous suits.  A third reason for the rule is to
> eliminate fraud actions in which all the facts are learned after discovery.  Finally,
> Rule 9(b) protects defendants from harm to their goodwill and reputation.

176 F.3d at 784 (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue

Cross Blue Shield of Ga., Inc*., 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990)).

In cases where there have been extensive allegations resulting in numerous instances of fraud, other courts have held that "[s]trict application of the requirements of Rule 9(b) may be relaxed . . . ." *California, ex rel. Ven-A-Care of the Fla. Keys, Inc. v. Abbott Labs., Inc.* (*In re Pharm. Indus. Average Wholesale Price Litig.*), 478 F. Supp. 2d 164, 171-72 (D. Mass. 2007) ("For instance, an alleged scheme of fraud may involve numerous transactions that occur over a long period of time, and pleading the precise specifics with regard to every instance of fraudulent conduct may be impractical.") (citing *Corley v. Rosewood Care Ctr., Inc*., 142 F.3d 1041, 1050 (7th Cir. 1998) (applying relaxed standard to allegations of fraud in plaintiff's racketeering complaint)); *United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206-07 (E.D. Tex. 1998) (collecting cases that apply relaxed standard)); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc*., 238 F. Supp. 2d 258, 268 (D.D.C. 2002) ("Additionally, where a complaint covers a multi-year period, Rule 9(b) may not require a detailed allegation of all facts supporting each and every instance of submission of a false claim.").

   *(2) Analysis*

Because Counts I-III are brought under the False Claims Act, an anti-fraud statute, the Complaint must comply with Rule 9(b). *See Harrison I*, 176 F.2d at 783-84. As detailed above, the Complaint contains specific allegations against all of the defendants, individually, and describes the scheme to defraud Medicare, including the methods used, paperwork falsified, and the locations targeted. Additionally, Exhibit A provides approximately 1,900 examples of the actual false claims submitted, and includes information regarding the date of service for the alleged false claim, the amount claimed, and the PCH where the mattress was placed. The Government also provided

Defendants with an unredacted copy of the exhibit that includes the name of the Medicare beneficiary for each alleged false claim.

There is no dispute that neither the Complaint nor the exhibits describe which Defendant submitted or caused any particular claim to be submitted, when the claim was submitted, or why the mattress was unnecessary. Thus, the issue is whether the failure to provide that information causes the Complaint to fall short of the Rule 9(b) standard. The Court **HOLDS** that, given the facts of this case, it does not.

Defendants rely heavily on *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1312 (11th Cir. 2002), and *United States ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 526 (D. Md. 2006), for the proposition that because the Complaint is missing certain information, it fails to satisfy Rule 9(b).[16] These cases are unpersuasive. Initially, the Court notes that other courts have joined the dissent's criticism of the majority in *Clausen* as focusing too much on "particularity," and not enough on the purpose of Rule 9(b) -- to give defendants notice of the claims against them. *Pogue*, 238 F. Supp. 2d at 268-69. Further, requiring the Government to provide the information requested by Defendants in the Complaint for all 1,900 claims neither comports with the purposes of Rule 9(b), nor the Fourth Circuit's cautionary instruction in *Harrison I*.

Three of the purposes behind Rule 9(b) are to protect defendants from frivolous suits, eliminate fraud actions in which all the facts are learned after discovery, and protect defendants from

---

[16] While not of great significance, unlike in both *Clausen* and *Brooks*, this is not a *qui tam* action, and therefore some concerns of preventing meritless cases from surviving a motion to dismiss under Rule 9(b) are not present. *See generally Clausen*, 290 F.3d at 1313 n.24 ("This is especially so in cases involving the False Claims Act, which provides a windfall for the first person to file and permits recovery on behalf of the real victim, the Government.").

harm to their goodwill and reputation. *Harrison I*, 176 F.3d at 784. Given that the Government alleges that Group II has already pled guilty to conduct it engaged in during the time Defendants worked for the company, finding that the allegations in the Complaint are sufficient to support a fraud claim does not run contrary to these purposes. First, because Group II pled guilty to making false statements relating to health care matters in violation of 18 U.S.C. § 1035(a)(2), and because a corporation acts through its agents, a civil lawsuit based on the false claims submitted by the corporation's agents is not frivolous. Likewise, because Defendants worked for Group II during the time in which the allegations in the information took place, the Government's lawsuit does not further the harm to their goodwill and reputation as they are already associated with the organization. Finally, and most importantly, as discussed in more detail below, the Government already has substantial prediscovery evidence of the allegations in the Complaint.

With respect to the Fourth Circuit's language in *Harrison I*, the Court is satisfied that Defendants have been made aware of the particular circumstances for which they will have to prepare a defense at trial, and is satisfied that the Government has substantial prediscovery evidence of those facts. Regarding the first part of that inquiry, "Rule 9(b) was not intended to require a plaintiff to know every detail before he or she could plead fraud." *United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1125 (E.D. Pa. 1991). Rather, the Government must make sufficient allegations to give Defendants enough information to prepare a defense for trial. Given the allegations in the Complaint, the Government has not only clearly alleged the particular circumstances of the scheme -- how Defendants targeted certain PCHs and how they answered the Medicare SOPs -- but also sufficiently alleged particular circumstances of the claims, including the

date of service, the amount billed to Medicare, and the patient's name.  The Court is satisfied that this information is sufficient enough to allow Defendants to prepare a defense for trial.

Next, it is clear that the Government has substantial prediscovery evidence of the relevant facts.  In order to receive compensation for the group II mattresses, the alleged false claims had to be submitted to the Government, and thus the Government is in possession of those claims and the information contained therein.  This is evidenced by the specificity detailed in Exhibit A, where the Government used the information contained in the submitted false claims to create the exhibit.  In fact, Eric Gwinn acknowledges this in his reply brief.  (Docket 115 at 7.) ("It is the Government that has control over the evidence in this case.  Group II's corporate documents were turned over to the Government by Group II's new owners prior to suit being filed.  Therefore, it is the Government that has control over all of the evidence in this matter.  The Defendant has no documentary evidence in this case other than that which has been provided by the Government.").  Accordingly, both conditions of *Harrison I* are met.

Also, the Complaint does not run contrary to the cases that hold "where there are multiple defendants, plaintiffs must allege all claims with particularity as to each defendant."  *See, e.g.*, *Dealers Supply Co. v. Cheil Indus.*, 348 F. Supp. 2d 579, 589 (M.D.N.C. 2004); *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 251 (D. Md. 2000); *Juntti v. Prudential-Bache Sec.*, 993 F.2d 228 (4th Cir. 1993) (table format), *reported in full*, 1993 U.S. App. LEXIS 10345, at *5 (unpublished) ("Further indicative of the insufficiently particular character of the complaint is its impermissible aggregation of defendants without specifically alleging which defendant was responsible for which act.").  In this case, the Government individually lists each defendant in many of its allegations.

Although Defendants argue that this is impermissibly grouping them together, it is clear from the allegations that the Government is indicating that all defendants undertook the actions described.

Furthermore, other courts have noted that, "[p]articularly in the context of federal FCA cases, the courts have recognized the impracticality of requiring the plaintiff to plead the facts of each individual claim, particularly where the claims are numerous and extend over the course of several years." *United States ex rel. Landsberg v. Argentis Med., P.C.*, No. 03-1263, 2006 U.S. Dist. LEXIS 96621, at *11-12 (W.D. Pa. Apr. 17, 2006), *adopted by*, 2006 U.S. Dist. LEXIS 43355 (W.D. Pa. June 27, 2006) (unpublished) (citing *Kensington Hosp.*, 760 F. Supp. at 1123; *Pogue*, 238 F. Supp. 2d at 268; *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1049 (S.D.Tex. 1998) ("The basic framework, procedures, the nature of fraudulent scheme, and the financial arrangements and inducements among the parties and physicians that give rise to Relator's belief that fraud has occurred have been alleged with specificity; Plaintiffs are entitled to discovery before being required to list every false claim, its dates, the individuals responsible, and why each patient was not eligible for Medicare.")).  The Court finds this rationale persuasive.

The Fourth Circuit insists that a district court hesitate to dismiss a case where it is satisfied that the defendant has been made aware of the particular circumstances for which he or she will have to prepare a defense at trial, and that the plaintiff has substantial prediscovery evidence of those facts.  *Harrison I*, 176 F.3d at 784.  In a False Claims Act case that spans several years and consists of hundreds of alleged false claims, a complaint could meet those conditions without alleging which defendant submitted each false claim or why it was unnecessary.  That is the case here.  The Government alleges that the claims were submitted to Medicare for payment, it informs Defendants how much those claims were, and details the scheme to defraud.  The fact that the date each claim

24

was submitted, the identity of the individual that caused the claim to be made, and the reason why the claim was unnecessary are absent from the Complaint is not fatal. The detail provided by the Government gives the Complaint an "indicia of reliability" that supports the allegation of an actual false claim for payment being made to the Government. *See Clausen*, 290 F.3d at 1311. Accordingly, although a complaint unquestionably meets the particularity requirement of Rule 9(b) when the time, place, and contents of the false representations, identity of the person making the misrepresentation, and what was obtained thereby are pled, *Harrison I*, 176 F.3d at 784, that information is not necessary where the number of claims is substantial, and the court is satisfied that the defendant has been made aware of the particular circumstances for which the defendant will have to prepare a defense at trial, and that the plaintiff has substantial prediscovery evidence of those facts. Otherwise, the court's instruction in *Harrison I* would be meaningless.

Because of the detailed factual allegations in the Government's Complaint, the exhibits attached to the Complaint and provided to Defendants, and the Government's control over the evidence in this case, the Court **FINDS** that the Complaint meets the specificity requirements of Rule 9(b). Therefore, the Court **DENIES** Defendants' motions to dismiss Counts I-III for failure to plead with particularity.

### D. Defendants' Motions to Dismiss Counts I-II Because Defendants Did Not "Knowingly" Submit False Claims

Defendants next argue that the Government has not alleged that they "knowingly" submitted false claims because the *treating physician* certified the need for the group II mattresses and because there are no allegations that Defendants "ever 'submitted' any 'claim' to anyone." (Docket 123 at 4.) Specifically, they argue that the United States cannot require DME suppliers, such as Group II, to obtain Medicare beneficiaries' medical records and make a judgment as to whether the equipment

25

is medically necessary and reasonable.  Because the determination of the need for the group II mattresses is made by a physician, Defendants argue that they could not "knowingly" submit a false claim to the United States.

The False Claims Act provides, in pertinent part, that "[a]ny person who [] knowingly presents or *causes to be presented*, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval[,]" or who "knowingly makes, uses, *or causes to be made or used*, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . is liable to the United States Government for a civil penalty . . . ." 31 U.S.C. §§ 3729(a)(1), (a)(2) (emphasis added).

The plain language of the statute does not require an individual to actually submit the false claim in order to be liable.  The False Claims Act "applies to anyone who knowingly assists in causing the government to pay claims grounded in fraud, without regard to whether that person has direct contractual relations with the government." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (citations and internal quotation marks omitted).  "'[A] person need not be the one who actually submitted the claim forms in order to be liable.'"  *Id*. (quoting *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001)).  Thus, Defendants' argument that they never actually "submitted" a claim is without merit because the Government alleges that they "presented and caused the presentation of false or fraudulent claims by Group II to Medicare . . . ."  (Second Am. Compl. ¶ 94.)

Furthermore, regarding actions under the False Claims Act, the term "knowingly" means:

[W]ith respect to information -- (1) has actual knowledge of the information;(2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

26

31 U.S.C. § 3729(b).

The Government alleges that Defendants supplied the information about the beneficiaries' medical conditions with knowledge that the answers did not accurately reflect those conditions because Defendants "created false Medicare SOPs by answering the six questions regarding medical necessity according to a standard formula and without regard to [the] individual beneficiary['s] condition." (Second Am. Compl. ¶ 76.) Also, the Government avers that Defendants "presented and caused the presentation of false or fraudulent claims . . . to Medicare . . . *knowing* that the beneficiaries did not meet the Medicare coverage criteria." (*Id.* ¶ 94) (emphasis added.) Therefore, the Government has sufficiently alleged that Defendants acted "knowingly."

Because the Government alleges that Defendants knowingly caused fraudulent claims to be presented and knowingly caused a false record or statement to be made or used to get a false or fraudulent claim paid or approved by the Government, it has stated valid claims, and Defendants' motions to dismiss on these bases are **DENIED**.

E.    *Motions to Dismiss for Lack of Personal Jurisdiction of Eric Gwinn, Murphy, and Binetti, or in the Alternative, Motions to Transfer Venue*

(1)    *Personal Jurisdiction*

Eric Gwinn, Murphy, and Binetti claim that the False Claims Act does not give this Court personal jurisdiction over them, and, even if the Act did grant personal jurisdiction over them, it violates due process.

"As prerequisites to exercising personal jurisdiction over a defendant, a federal court must have jurisdiction over the subject matter of the suit, venue, 'a constitutionally sufficient relationship between the defendant and the forum,' and 'authorization for service of a summons on the person.'"

27

*ESAB Group v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997) (quoting *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)).

The Court clearly has subject matter jurisdiction over the suit because it arose "under the . . . laws . . . of the United States[,]" namely the False Claims Act. *See* 28 U.S.C. § 1331. Next, with respect to the authorization for service of a summons on the person, "Federal Rule of Civil Procedure 4(k)(1) provides that 'service of a summons or filing a waiver of service is effective to establish [a federal court's] jurisdiction over the person of a defendant' if such service is accomplished on a defendant whom the law has made amenable to the court's process." *ESAB Group*, 126 F.3d at 622. Rule 4(k) sets forth "five sources authorizing service to effect *in personam* jurisdiction" -- one of them is a federal statute. *Id.* Here, the False Claims Act authorizes such service. Section 3732(a) provides that "[a] summons as required by the Federal Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States." Because Defendants were served within the United States, service was valid.

Third, the Act provides that venue is appropriate where, "in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by [31 U.S.C. § 3729] occurred." 31 U.S.C. § 3732(a). Because Group II had its primary business in or around Raleigh County, and because the Government sufficiently alleges that at least one act proscribed by 31 U.S.C. § 3729 occurred in the Southern District of West Virginia -- Defendants allegedly presented and caused the presentation of false or fraudulent claims to Medicare -- venue is appropriate.

The final requirement is that a constitutionally sufficient relationship exist between the defendant and the forum. To be permissible, Defendants must "have certain minimum contacts with

28

[the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). "Where Congress has authorized nationwide service of process by federal courts under specific federal statutes, so long as the assertion of jurisdiction over the defendant is compatible with due process, the service of process is sufficient to establish the jurisdiction of the federal court over the person of the defendant." *Hogue v. Milodon Eng'g, Inc*., 736 F.2d 989, 991 (4th Cir. 1984); *see also Boon Partners v. Advanced Fin. Concepts*, 917 F. Supp. 392, 397 (W.D.N.C. 1996).

In order to be compatible with due process, courts have determined that "[w]here . . . there is a federal statute that permits worldwide service of process, the relevant inquiry is whether the defendants have *minimum contacts with the United States as a whole*[,]" and is not the traditional inquiry of whether the defendants have minimum contacts with the forum state. *United States ex rel. Thistlethwaite v. Dowty Woodville Polymer*, 976 F. Supp. 207, 210 (S.D.N.Y. 1997) (emphasis added) (citing *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994) (listing cases); *Tex. Trading & Milling Corp. v. Fed. Republic of Nig.*, 647 F.2d 300, 314 (2d Cir. 1981), *cert. denied*, 454 U.S. 1148 (1982)). This is commonly referred to as the "national contacts" test. *See Schrader v. Trucking Employees of N. Jersey Welfare Fund, Inc.-Pension Fund*, 232 F. Supp. 2d 560, 572 (M.D.N.C. 2002) (applying the "national contacts" test to the Employee Retirement Income Security Act, which provides for nationwide service of process).

Here, the False Claims Act "provides for worldwide service of process." *United States ex rel. Vallejo v. Investronica, Inc.*, 2 F. Supp. 2d 330, 334 (W.D.N.Y. 1998) (citing 31 U.S.C. § 3732(a)). Although the Fourth Circuit has not adopted this test as applied to the False Claims Act,

the court has adopted it in the context of the Racketeer Influenced and Corrupt Organizations Act, "as well as the Bankruptcy Act, both of which contain provisions for nationwide service of process." *Schrader*, 232 F. Supp. 2d at 571 n.13 (citing *ESAB Group, Inc.*, 126 F.3d at 626; *Hogue*, 736 F.2d at 989). Thus, the Court **FINDS** that the application of the "national contacts" test is appropriate in this case, and the Court's due process analysis focuses not on Defendants' minimum contacts with West Virginia, but rather on the Defendants' minimum contacts with the United States as a whole. *See United States ex rel. Finks v. Huda*, 205 F.R.D. 225, 227-28 (S.D. Ill. 2001) (finding that the proper forum on which to base a minimum contacts analysis in a False Claims Act case is the United States, and not the state where the district court sat); *Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03 Civ. 3120, 2006 U.S. Dist. LEXIS 49067, at *24 (S.D.N.Y. July 18, 2006) (unpublished) (holding where a federal statute permits worldwide service of process, "the relevant 'forum state' is the entire United States[]").

Because Eric Gwinn and Binetti are residents of Virginia, and because Murphy is a resident of North Carolina, they clearly have "minimum contacts with the United States as a whole[,]" and satisfy the "national contacts" test. *Thistlethwaite*, 976 F. Supp. at 210.

However, this does not end the due process inquiry. "The Fifth Amendment's Due Process Clause not only limits the extraterritorial scope of federal sovereign power, but also protects the liberty interests of individuals against unfair burden and inconvenience." *ESAB Group, Inc.*, 126 F.3d at 627. "However, . . . it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern[.]" *Id.* (internal quotation marks and citation omitted). Thus, unless Defendants can prove that litigating this case in West Virginia places an unfair burden or

inconvenience upon them, personal jurisdiction is compatible with the Due Process Clause of the Fifth Amendment.

Defendants have not put forth any evidence to establish "extreme inconvenience or unfairness as would outweigh the congressionally articulated policy of allowing the assertion of *in personam* jurisdiction" in this Court. *Id.* at 627. Thus, because the "national contacts" test is satisfied, and because there is neither extreme inconvenience nor unfairness in this case, any argument focusing on fairness can be resolved through application of the federal venue and transfer statutes, 28 U.S.C. §§ 1391, 1404, which is discussed *infra*. *See id.* at 627 (citing *Hogue*, 736 F.2d at 991).

Accordingly, the Court has personal jurisdiction over the Government's False Claims Act counts against Eric Gwinn, Murphy, and Binetti, and their motions to dismiss on that ground are **DENIED**. Likewise, the Court also has jurisdiction over the Government's state law claims. *See id.* at 628 ("[W]e conclude that under the doctrine of pendent personal jurisdiction, the district court has authority over the defendants to decide both the federal and the state claims alleged against them.").

### (2)   *Improper Venue*

Alternatively, Murphy moves for dismissal for improper venue under Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406, and in the event that his motion to dismiss is unsuccessful, he, along with Eric Gwinn, move to transfer under 28 U.S.C. § 1404(a). In a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(3), the plaintiff has the burden to establish that venue is proper. *Bartholomew v. Va. Chiropractors Ass'n, Inc.*, 612 F.2d 812, 816 (4th Cir. 1979), *overruled on other grounds by Ratino v. Med. Serv. of D.C.*, 718 F.2d 1260 (4th Cir. 1983). As discussed above, pursuant to 31 U.S.C. §

3732(a), in actions brought under the False Claims Act, venue is appropriate where, "in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by [31 U.S.C. § 3729] occurred." Because the Court has already determined that the Complaint alleges that acts proscribed by 31 U.S.C. § 3729 were performed within the Southern District of West Virginia, venue is proper, and dismissal is not warranted.

(3)     Transfer of Venue

With respect to the motions to transfer venue of Eric Gwinn and Murphy pursuant to 28 U.S.C. § 1404(a), the Court *may*, for the convenience of the parties and in the interests of justice, transfer the case to any other district or division where the action might have been brought.  28 U.S.C. § 1404(a).  Thus, the Court must first determine if the case could have been brought in the districts to which Eric Gwinn and Murphy request their cases be moved -- the Eastern District of Virginia and the Eastern District of North Carolina.  *See Hoffman v. Blaski*, 363 U.S. 335, 342-44 (1959).  Because each defendant resides in their requested district, 31 U.S.C. § 3732(a) permits the case to have been brought in both of those districts.

The next inquiry is whether a transfer would be for the convenience of the parties and in the interests of justice.  A transfer under § 1404(a) is dependent upon the weighing "a number of case-specific factors."  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).

> Factors commonly considered in ruling on a transfer motion include: (1) ease of access to sources of proof; (2) the convenience of parties and witnesses; (3) the cost of obtaining the attendance of witnesses; (4) the availability of compulsory process; (5) the possibility of a view; (6) the interest in having local controversies decided at home; and (7) the interests of justice.

*AFA Enters., Inc. v. Am. States Ins. Co.*, 842 F. Supp. 902, 909 (S.D. W. Va. 1994) (Haden, J.). However, the plaintiff's forum selection is accorded considerable weight.  *Id.*; *Collins v. Straight,*

*Inc.,* 748 F.2d 916, 921 (4th Cir. 1984).  Indeed, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).  Moreover, deference to the plaintiff's choice of forum is especially important when the plaintiff "has not chosen a foreign forum or one bearing little or no relation to the cause of action." *Reynolds Metals Co. v. FMALI, Inc.*, 862 F. Supp. 1496, 1501 (E.D. Va. 1994) (quotation marks and citations omitted).  Importantly, "transfer . . . will be denied if it would merely shift the inconvenience from the defendant to the plaintiff." *AFA Enters., Inc.*, 842 F. Supp. at 909.

Here, neither Murphy nor Eric Gwinn have established that the balance strongly weighs in their favor, and thus the Court will not disturb the Government's choice of forum.  First, as the United States notes, it filed in this district because Group II operated, submitted claims, received payments from Medicare, and pled guilty to criminal charges within the Southern District of West Virginia.  The Court gives that choice considerable weight and deference because the Government neither chose a foreign forum nor one bearing little or no relation to the cause of action.  *See Reynolds Metals Co.*, 862 F. Supp. at 1501.  Furthermore, it would not be in the "interests of justice" to all the parties in this case to transfer either defendant's case to a different district because the claims against Binetti and Charlie Gwinn would proceed in this district regardless, with many issues being the same.  Further, the Court notes that this case has been pending since 2006, and there are currently several discovery motions pending before the magistrate judge.  Any transfer would severely inhibit progress toward a resolution.  Whatever inconvenience Eric Gwinn and Murphy would sustain is outweighed by the Government's burden of having to conduct three trials in three different districts based on facts and legal issues arising from the same set of circumstances.  *See United States ex rel. Penizotto v. Bates E. Corp.*, No. 94-3626, 1996 U.S. Dist. LEXIS 10316, at *14

33

(E.D. Pa. July 19, 1996) (unpublished) ("After all, the administration of justice will ordinarily not be served by permitting litigation with virtually the same parties and issues to proceed in different jurisdictions at the same time.") (citing *Ballard Med. Prods. v. Concord Lab., Inc.*, 700 F. Supp. 796, 801 (D. Del. 1988); *Blanning v. Tisch*, 378 F. Supp. 1058, 1061 (E.D. Pa. 1974)). Thus, a transfer would merely shift the inconvenience from Eric Gwinn and Murphy to the Government for having to expend costs on separate litigation, to the witnesses for having to appear at trial in three different states, and to the federal court system. If the Court granted both motions, then substantially more judicial and governmental resources would be used in bringing these cases to trial. Accordingly, it would be in the interests of judicial economy to retain the entire case in this district.

With respect to the other factors, compulsory process of unwilling witnesses is available pursuant to the False Claims Act, 31 U.S.C. § 3731(a),[17] and neither defendant has shown that the cost of obtaining attendance of willing witnesses will be any greater than in North Carolina or Virginia. Additionally, it appears that the "ease of access to sources of proof" disfavors transfer to another district. Although some witnesses may be located in the other districts, the presence of these witnesses does not outweigh the other factors that weigh in favor of retaining the entire case in this district.

For these reasons, the Court declines to transfer this case as to either Eric Gwinn or Murphy, and Defendants' motions on this basis are **DENIED**.

---

[17] *See Little ex rel. U.S. Gov't v. ENI Petroleum Co.*, No. 06-120-M, 2007 U.S. Dist. LEXIS 56979, at *11 (W.D. Okla. Aug. 3, 2007) (unpublished); *Penizotto*, 1996 U.S. Dist. LEXIS 10316, at *13 (citing 31 U.S.C. § 3731(a)) ("Under the [False Claims Act], parties have nationwide power to subpoena all witnesses to testify at trial, regardless of the location of the pending action. . . . Therefore, all potential witnesses are available for compulsory service of process, irrespective of whether the trial proceeds in California or Pennsylvania.").

F.     *Murphy's Motion to Sever, and Motion to Dismiss for Failure to Name Group II as a Necessary and Indispensable Party*

(1)     *Severance*

Murphy argues, without citing any legal authority, that, pursuant to Fed. R. Civ. P. 21, he was misjoined and the Government's claims against him should be severed and proceed separately.

Rule 21 of the Federal Rules of Civil Procedure reads: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party."  Joinder of defendants is permissible if (1) "any right to relief is asserted against [the defendants] jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences;" and (2) "any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2).  The joinder rule "should be construed in light of its purpose, which 'is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits.'"  *Carbon Fuel Co. v. USX Corp.*, 867 F. Supp. 414, 418 (S.D. W. Va. 1994) (Haden, J.) (quoting *Saval v. BL Ltd.*, 710 F.2d 1027, 1031 (4th Cir. 1983)).

The claims against Murphy arise out of the same series of transactions, and share common questions of law and fact as the claims against his co-defendants.  The claims arise out of the same series of transactions because Defendants allegedly participated in the marketing of group II mattresses for Medicare beneficiaries who did not meet Medicare coverage criteria and subsequently submitted false claims to Medicare for those mattresses.  Further, the claims share common questions of law and fact.  These questions include whether the beneficiaries met the Medicare coverage criteria, whether the claims submitted were false, whether Defendants caused the

35

submission of the claims by Group II, and whether Defendants acted knowingly.  Consequently,

joinder is appropriate, and Murphy's request for severance is **DENIED**.

(2)     *Group II as a Necessary and Indispensable Party*

Murphy also contends, again without citing any legal authority, that the Government's

Complaint fails to name Group II as a necessary and indispensable party and therefore should be

dismissed pursuant to Fed. R. Civ. P. 19.  Specifically, he argues that his ability to protect his

interests and rights will be impaired and impeded with the absence of Group II as a named defendant

because he will be unable to fully and completely defend the Government's allegations, as critical

discovery from Group II would be unavailable and he will be at risk of multiple or inconsistent

obligations.  He gives no explanation as to how or why this would occur.  The Government counters

that Murphy can conduct third-party discovery and initiate a separate action against the company

should he choose.

"To determine whether a party should be joined, Rule 19 of the Federal Rules of Civil

Procedure sets forth a two-step inquiry, examining: (1) whether the party is 'necessary' to the action

under Rule 19(a); and (2) whether the party is 'indispensable' under Rule 19(b)."[18] *Am. Gen. Life*

---

[18]  Fed. R. Civ. P. 19(a) provides, in pertinent part:

> A person who is subject to service of process and whose joinder will not deprive the
> court of jurisdiction over the subject matter of the action shall be joined as a party
> in the action if (1) in the person's absence complete relief cannot be accorded among
> those already parties, or (2) the person claims an interest relating to the subject of the
> action and is so situated that the disposition of the action in the person's absence may
> (i) as a practical matter impair or impede the person's ability to protect that interest
> or (ii) leave any of the persons already parties subject to a substantial risk of
> incurring double, multiple, or otherwise inconsistent obligations by reason of the
> claimed interest.

36

& *Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005).  Importantly, "[t]he burden of proof rests on the party raising the defense . . . to 'show that the person who was not joined is needed for a just adjudication.'" *Id*. (citation omitted).

Because Murphy offers no explanation as to why the absence of Group II will affect his ability to protect his interests and rights, he fails to meet his burden of proof, and his motion to dismiss for failure to name Group II is also **DENIED**.

>    G.    *Defendants' Motions to Dismiss Count III Pursuant to the Intracorporate Conspiracy Doctrine*

Finally, Defendants argue that Count III of the Government's complaint is barred by the intracorporate conspiracy doctrine.  Count III alleges that Defendants conspired with each other, Tracy Webber, and other Group II employees to defraud the United States by getting false or fraudulent claims allowed or paid by the United States.[19]

The Government responds by asserting first, that the doctrine does not apply because it derives from antitrust law, and unlike antitrust law, the purpose of the False Claims Act is not furthered by immunizing a conspiracy among employees of a corporation and allowing them to hide behind the corporate shield.  Second, the Government argues that even if the doctrine does apply, then the so-called "independent personal stake" exception, which precludes use of the doctrine where an employee has an independent personal stake in achieving a corporation's illegal objective, permits the conspiracy claim.  According to the Government, because Defendants earned

---

[19] "Section 3729(a)(3) imposes [False Claims Act] liability on any person who 'conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." *United States ex rel. DRC, Inc. v. Custer Battles*, LLC, 376 F. Supp. 2d 617, 651 (E.D. Va. 2005) (quoting 31 U.S.C. § 3729(a)(3)).

commissions on revenue Group II generated from the group II mattresses, they had an independent personal stake in the conspiracy and therefore the exception applies.

### (1)    The Intracorporate Conspiracy Doctrine's Applicability

"Under the intra-corporate [conspiracy] doctrine, which has been applied in the [False Claims Act] context, a corporation cannot conspire with its own officers while the officers are acting in their official capacity." *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 376 F. Supp. 2d 617, 651 (E.D. Va. 2005) (*Custer Battles*) (quotation marks and footnote omitted). Similarly, under the doctrine, agents of the same principal cannot conspire with one another. *See Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985) (quoting *Cole v. Univ. of Hartford*, 391 F. Supp. 888, 893 (D. Conn. 1975) ("Simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation.")); *Grose v. Mansfield Corr. Inst.*, No. No. 1:06-cv-2720, 2007 U.S. Dist. LEXIS 71017, at *8 (N.D. Ohio Sept. 24, 2007) (unpublished) ("Thus, under the intracorporate conspiracy doctrine, two employees or agents of the same corporation cannot form a conspiracy with one another because they are not considered 'two or more separate persons.'"); *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509-10 (6th Cir. 1991) (dismissing, pursuant to the intracorporate conspiracy doctrine, a conspiracy claim brought against agents of a school board); *Runs After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985) (no conspiracy involving members of Indian tribal council).

The rationale for the doctrine is that since the acts of a corporate agent are the acts of the corporation, a conspiracy among the agents of the corporation, or among an agent and the corporation, is in effect a conspiracy with only one actor -- the corporation. *See Buschi*, 775 F.2d

at 1251-54; *but see Kirwin v. Price Communs. Corp.*, 391 F.3d 1323, 1327 (11th Cir. 2004) ("Corporations and their agents are distinct entities and, thus, agents may be held liable for their own conspiratorial actions.").

The intracorporate conspiracy doctrine finds its roots in antitrust law, and was first developed in *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911 (5th Cir. 1952), *cert. denied*, 345 U.S. 925 (1953), an antitrust case brought because of an alleged conspiracy between the defendant corporation and its officers, employees, and agents.  In *Nelson*, the court stated:

> It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.

200 F.2d at 914.

The United States Supreme Court has endorsed this view with respect to antitrust actions under § 1 of the Sherman Act.  For example, in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984), the Court held that § 1 of the Sherman Act does not "exclude[] coordinated conduct among officers or employees of the *same* company . . . [nor does] an internal 'agreement' to implement a single, unitary firm's policies . . . raise the antitrust dangers that § 1 was designed to police."  This concept rests upon the basic principles of agency and conspiracy law, and the obvious notion that a conspiracy among agents of one corporation will not restrain trade.  *See* David Warner, Comment, *Are the Corporation and Its Employees the Same?: Piercing the Intracorporate Conspiracy Doctrine in a Post-Enron World*, 55 Kan. L. Rev. 1057 (2007) ("The theory makes sense logically in [the antitrust] context because a single corporation could not attempt to restrain trade or monopolize a particular market acting only with its agents.").

39

The Supreme Court again addressed the intracorporate conspiracy doctrine in *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001) (*Cedric Kushner*), where the Court held that an agent and a corporation could be sued under § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO) without conflicting with the doctrine.  Specifically, the Court stated:

> [The Court's holding] does not deny that a corporation acts through its employees; it says only that the corporation and its employees are not legally identical. It does not assert that ordinary *respondeat superior* principles make a corporation legally liable under RICO for the criminal acts of its employees; that is a matter of congressional intent not before us. Neither is it inconsistent with antitrust law's intracorporate conspiracy doctrine; *that doctrine turns on specific antitrust objectives*.  Rather, we hold simply that the need for two distinct entities is satisfied; hence, the RICO provision before us applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner -- whether he conducts those affairs within the scope, or beyond the scope, of corporate authority.

*Id*. (citations omitted and emphasis added).

The Government contends that because of this language in the Supreme Court's *Cedric Kushner* opinion, the intracorporate conspiracy doctrine is inapplicable in a non-antitrust case such as this one.[20]  Although the Supreme Court's language does not explicitly state this limitation, the Government argues that the language requires the application of the doctrine to "turn on" the specific objectives of the statute in question.

---

[20]   Notably, at least one other district court within the Fourth Circuit has rejected this precise argument.  *See Culver v. JBC Legal Group, P.C.*, No. 5:04-cv-389, 2005 U.S. Dist. LEXIS 45426, at *17-18 (W.D.N.C. June 28, 2005) (unpublished) (rejecting the plaintiff's argument that the doctrine should be limited only to cases alleging conspiracy with respect to the Sherman Anti-Trust Act and applying it to a civil conspiracy case under North Carolina law); *see also Locus v. Fayetteville State Univ.*, 870 F.2d 655 (table), 1989 WL 21442, at *2 (4th Cir. Mar. 8, 1989).

In *Cedric Kushner*, the Court found that the doctrine was not applicable in the RICO context under § 1962(c) because the legislative intent of RICO is "clearly aimed at individual 'racketeers' infiltrating legitimate business[,]" whereas the antitrust laws "are ultimately intended to prevent corporations from exerting monopolizing anticompetitive force[.]"  *USA Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d 319, 330, n.3 (S.D.N.Y. 2007) (citing *Cedric Kushner*, 533 U.S. at 166). Thus, as the argument goes, because the antitrust statutes are designed to prevent the restraint on trade, two separate and distinct entities must be present, or else there would not be any restraint.  *See Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 542 (4th Cir. 1991) ("Fundamentally, for there to be a violation of § 1 of the Sherman Act two or more persons must act in concert. Generally, a business has the right to deal or not deal with whomever it likes, as long as it does so independently.").  As such, in an antitrust case, application of the doctrine is consistent with statutory objectives.  Typically, this is not the case with the False Claims Act because the purpose of the Act is to fight the fraudulent and false submission of claims to the Government.  *See United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1041 (10th Cir. 2004) (citing S. Rep. No. 99-345, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266).  Thus, in applying the doctrine, a court would not further this goal, but rather would inhibit it by allowing defendants to hide behind the corporate shield.  Due to the different statutory objectives, the Government asserts that the doctrine should not bar its conspiracy claim against Defendants.

In analyzing this issue, it is important to note that the context of the Supreme Court's discussion in *Cedric Kushner* did not arise under 18 U.S.C. § 1962(d), which is the civil RICO

conspiracy statute.[21]  Rather, it arose under 18 U.S.C. § 1962(c), which, by definition, requires a person and an enterprise.[22]  Thus, even though the Supreme Court has said that the intracorporate conspiracy doctrine does not apply to subsection (c), it left open the question of whether it applies to subsection (d) (the conspiracy statute), which is an issue that is currently the subject of a circuit split.  *See Broussard v. Meineke Discount Muffler Shops*, 945 F. Supp. 901, 911 (W.D.N.C. 1996) (noting the split).

Prior to *Cedric Kushner*, the Seventh and Ninth Circuits addressed this issue and held that a defendant may not bar a plaintiff's RICO conspiracy claim by relying on the intracorporate conspiracy doctrine.  *See Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 787 (9th Cir. 1996) ("We agree with the reasoning of our sister circuit, and hold that § 1962(d) applies to intracorporate conspiracies."); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989) (stating that the intracorporate conspiracy doctrine threatens the purpose of RICO).[23]  After *Cedric Kushner*, the

---

[21]  "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).

[22]  Section 1962(c) provides, in pertinent part:

> It shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of [the] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

[23]  In *Ashland Oil, Inc.*, the Seventh Circuit found that intracorporate conspiracies were actionable under RICO by distinguishing the Supreme Court's contrary ruling in antitrust cases:

> Since a subsidiary and its parent theoretically have a community of interest, a conspiracy 'in restraint of trade' between them poses no threat to the goals of antitrust law -- protecting competition. In contrast, intracorporate conspiracies do threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits.

(continued...)

Eleventh Circuit relied on the Seventh Circuit, Ninth Circuit, and *Cedric Kushner*, and also held that the doctrine does not apply in a RICO conspiracy case. *See Kirwin*, 391 F.3d at 1327. In *Kirwin*, the Eleventh Circuit held that "the intracorporate conspiracy doctrine cannot be invoked to defeat a § 1962(d) claim[,]" and stated: "Corporations and their agents are distinct entities and, thus, agents may be held liable for their own conspiratorial actions."[24] 391 F.3d at 1327 (citing *Cedric Kushner*, 533 U.S. at 163).

Contrary to *Kirwin*, other courts interpreting the Supreme Court's language regarding the objectives of the statute in question find that *Cedric Kushner* is limited in its holding. *See generally United States ex rel. Bartlett v. Tyrone Hosp., Inc.*, 234 F.R.D. 113, 128 (E.D. Pa. 2006). In *Bartlett*, the court applied the intracorporate conspiracy doctrine in a civil rights discrimination case and held that the doctrine is not limited to antitrust litigation, by finding that no express language in *Cedric Kushner* restricted the doctrine to antitrust cases.[25]

---

[23](...continued)
875 F.2d at 1281.

[24] Courts within the Fourth Circuit have rejected this reasoning by noting that the court relies on the "fundamental tenet" that a corporation cannot conspire with itself. *Broussard*, 945 F. Supp. at 911-12; *Sadighi v. Daghighfekr*, 36 F. Supp. 2d 279, 297 (D.S.C. 1999); *Huntingdon Life Sciences v. Rokke*, 986 F. Supp. 982, 991 (E.D. Va. 1997) (noting that there are no Fourth Circuit cases addressing the doctrine in the context of a RICO claim). The court in *Kirwin* cited *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997), in support of the statement that the Fourth Circuit has reached the conclusion that the intracorporate conspiracy doctrine bars § 1962(d) claims. However, it appears the conspiracy claim at issue in *Detrick* was under the Virginia conspiracy statute. *Id*. ("Panalpina argues that the district court erred in dismissing Panalpina's breach of contract and Virginia conspiracy statute counterclaims.").

[25] The plaintiff in *Bartlett* alleged a conspiracy between the principal entity and the agent, and the district court specifically stated it could not practically envision how the two could conspire to discriminate. 234 F.R.D. at 128. That situation is not analogous to the case before the Court, as it is entirely possible for the employees of Group II to conspire with one another.

Unfortunately, the Fourth Circuit has yet to comment on *Cedric Kushner*'s impact on the intracorporate conspiracy doctrine. Based on its recent case law, however, it would likely reject the Government's argument and the reasoning and language of the Eleventh Circuit in *Kirwin* by continuing to hold that the doctrine is generally applicable to conspiracy actions against agents of a corporation. *See, e.g.*, *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179-80 (4th Cir. 2002).[26] Although the intracorporate conspiracy doctrine originally arose in antitrust cases, "the Fourth Circuit has consistently applied it in other contexts[.]" *See Veney v. Ojeda*, 321 F. Supp. 2d 733, 748 (E.D. Va. 2004). Because it relies on cases which cite the basic principles of agency and conspiracy law in support of the application of the intracorporate conspiracy doctrine, it is apparent that the Fourth Circuit gives these principles great weight. *See Buschi*, 775 F.2d at 1251 (citing *Nelson Radio & Supply Co.*, 200 F.2d at 914); *Broussard*, 945 F. Supp. at 911-12 (discussing the Fourth Circuit's "fundamental tenet"). It has continuously reaffirmed the principle that the "doctrine dictates that a single entity cannot conspire amongst itself." *Cohn v. Bond*, 953 F.2d 154, 159 (4th Cir. 1991); *see also Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 224 (4th Cir. 2004).

Since *Cedric Kushner*, the Fourth Circuit has continued to utilize the doctrine in other non-antitrust conspiracy cases, albeit mostly in state conspiracy claims. *See, e.g.*, *Lewin v. Cooke*, 28 F. App'x 186 (4th Cir. 2002) (unpublished) (applying the doctrine to a plaintiff's state conspiracy claim); *ePlus*, 313 F.3d at 179-80. Prior to *Cedric Kushner*, in *Detrick*, 108 F.3d at 544, the Fourth Circuit applied the intracorporate conspiracy doctrine to a conspiracy claim based on Virginia law,

---

[26] In *ePlus*, it is unclear whether the doctrine was applied to a state civil conspiracy under Virginia law, or the RICO civil conspiracy claim under § 1962(d), or both. Regardless, the court ultimately did not prohibit the plaintiff's conspiracy claim because the court found that the personal stake exception applied. *See also Sadighi*, 36 F. Supp. 2d at 297 (applying the doctrine to § 1962(d)).

without commenting on the doctrine's limited applicability. Then, in another case, *Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 224 (4th Cir. 2004), which is a post-*Cedric Kushner* case, the Fourth Circuit cited both *Detrick* and *ePlus* to support the general proposition that a conspiracy cannot exist between agents of a corporation without restricting the doctrine's applicability to an antitrust case.

Further, there are several district court cases within the Fourth Circuit that have applied the doctrine to other types of non-antitrust cases. *See Custer Battles*, 376 F. Supp. 2d at 651; *Chavez v. McIntyre*, 424 F. Supp. 2d 858, 860-61 (W.D. Va. 2006) (applying the "unauthorized acts" exception to the doctrine in a civil rights case); *Godfredson v. JBC Legal Group, P.C.*, 387 F. Supp. 2d 543, 550 (W.D.N.C. 2005) (applying the doctrine to a civil conspiracy case under North Carolina law); *Hoffman v. Balt. Police Dep't*, 379 F. Supp. 2d 778, 796 n.15 (D. Md. 2005) (noting that the Fourth Circuit has applied the doctrine in the civil rights context); *Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627, 634 (M.D.N.C. 2000) (noting that the Fourth Circuit has not recognized the "policy or custom" exception to the intracorporate conspiracy doctrine and has applied it in the civil rights context); *see also Sadighi*, 36 F. Supp. 2d at 297 (applying the doctrine to § 1962(d)).

Additionally, the Second, Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits have extended the doctrine to federal civil rights conspiracy claims.[27] *See, e.g.*, *Herrmann v. Moore*, 576 F.2d 453,

---

[27] There are a minority of circuits that do not apply the doctrine to these claims. *See McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1038 (11th Cir. 2000) (citing *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir.1994) (declining to apply the intracorporate conspiracy doctrine to a § 1985(2) claim because the intracorporate conspiracy doctrine, "designed to allow one corporation to take actions that two corporations could not agree to do, should not be construed to permit the same corporation and its employees to engage in civil rights violations"); *Stathos v. Bowden*, 728 F.2d 15, 21 (1st Cir.1984) (finding that the "boundaries of an 'intracorporate' exception to § 1985(3) conspiracy provision should be narrower than in antitrust" and holding the intracorporate conspiracy (continued...)

459 (2d Cir. 1978); *Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994)*; Doherty v. Am. Motors Corp.*, 728 F.2d 334, 339-40 (6th Cir. 1984); *Payton v. Rush-Presbyterian*, 184 F.3d 623, 632 (7th Cir. 1999) (under the intracorporate conspiracy doctrine, a conspiracy cannot exist between members of the same entity); *Baker v. Stuart Broad. Co.*, 505 F.2d 181, 183 (8th Cir. 1974); *Dickerson v. Alachua County Cmm'n*, 200 F.3d 761, 768-69 (11th Cir. 2000).[28]

Thus, on one hand, there are the basic principles of conspiracy and agency law, and on the other, there is the Supreme Court's comment that the intracorporate conspiracy doctrine "turns on" the applicable statute's objectives. Given that the Supreme Court did not expand its language and explicitly hold that the doctrine was limited to the antitrust context, the basic principles of conspiracy and agency law require that the intracorporate conspiracy doctrine bar conspiracy claims under the False Claims Act, 31 U.S.C. § 3729(a)(3). As the district court in *Bartlett* stated, there is no express language in *Cedric Kushner* that restricts the application of the doctrine to antitrust cases,

---

[27](...continued)
doctrine did not apply in the present case because "defendants' activities [] went beyond 'a single act' of discrimination"); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1256-59 (3d Cir.1978), *vacated on other grounds*, 442 U.S. 366 (1979)).

[28] Like the Eleventh Circuit, although the Seventh Circuit holds that a RICO conspiracy claim is not subject to the intracorporate conspiracy doctrine, *Ashland Oil, Inc*., 875 F.2d at 1281, it does hold that a civil rights conspiracy claim against members of the same entity should be dismissed pursuant to the doctrine. *See Payton*, 184 F.3d at 632. This is internally inconsistent. There is no reason to apply the doctrine in the civil rights cases, but not in the RICO context. Neither statutory objective is analogous to the antitrust objective, and thus, if a court applies the doctrine in one context, it should also apply it to the other. The Eleventh Circuit stated in *Kirwin* that "agents may be held liable for their own conspiratorial actions[.]"  391 F.3d at 1327.  In order to stay true to that language, the doctrine should not apply in either RICO cases or a civil rights cases. However, the court holds otherwise. *See, e.g.*, *Albra v. City of Fort Lauderdale*, 232 F. App'x 885, 890 (11th Cir. Apr. 25, 2007) (unpublished) ("Under the doctrine of intracorporate conspiracy, [in a civil rights case] 'a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves' because a corporation and its employees are considered to be 'a single legal actor.'").

and the Fourth Circuit, and other courts within the circuit, have had the opportunity to restrict the application of the doctrine after *Cedric Kushner* but have declined to do so.  In fact, as other courts have noted, the doctrine's "application should not depend on the perceived importance of the issue or public policy involved[,]" *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1059 (C.D. Cal. 2000), but rather on the well-established basic principles of conspiracy law.

Specifically, with respect to the False Claims Act, several courts hold that the intracorporate conspiracy doctrine applies to cases brought under the Act.  *See Custer Battles*, 376 F. Supp. 2d at 651 n.89 (citing *United States v. Warning*, No. 93-4541, 1994 U.S. Dist. LEXIS 10402, at *12 (E.D. Pa. July 27, 1994) (unpublished); *United States v. EER Sys. Corp.*, 950 F. Supp. 130, 133 (D. Md. 1996)).  Although no court has discussed in detail the doctrine's applicability to a conspiracy under the False Claims Act,[29] the Court notes that at least two other district courts, in addition to *Custer Battles*, have applied the doctrine to the False Claims Act after *Cedric Kushner*.  *See United States ex rel. Fago v. M&T Mortgage Corp.*, 518 F. Supp. 2d 108, 117-18 (D.D.C. 2007); *United States ex rel. Fent v. L-3 Communs. Aero Tech LLC*, No. 05-cv-0265-CVE-SAJ, 2007 U.S. Dist. LEXIS 81976, at *14-15 (N.D. Okla. Nov. 2, 2007) (unpublished) (applying the intracorporate conspiracy doctrine to the False Claims Act although the Tenth Circuit has not yet adopted it in such a case).

Given the applicable law in this circuit, it is clear that the Fourth Circuit accords a significant amount of weight to the basic principal that it is a legal impossibility for a corporation to conspire with its agents, and likewise, for its agents to conspire with one another.  *Broussard*, 945 F. Supp.

---

[29] In *United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151, 199 n.40 (D. Mass. 2004) (emphasis added), the court noted that the intracorporate conspiracy doctrine "holds a corporation cannot conspire with its own employees or agents, because that would be conspiring with itself[,]" but cited *Cedric Kushner* and opined that "*it is questionable whether [the doctrine] would apply to an FCA case*."

911-12 (discussing the Fourth Circuit's "fundamental tenet"). Thus, the Court will not construe the Supreme Court's language in *Cedric Kushner* as limiting the application of the doctrine to antitrust cases because the basic principles of agency and conspiracy law trump the Government's argument that the statute's purpose and policy should govern. *See Thomas*, 157 F. Supp. 2d at 634. In fact, in order for the Government's argument to prevail, the Court would have to ignore decades of Fourth Circuit case law. The language in *Cedric Kushner* is simply not strong enough to discredit the cases within the Fourth Circuit that have recently applied the doctrine outside the antitrust context. For the doctrine not to apply in this case, and for the Court to be internally consistent, it would also have to hold that the doctrine was inapplicable in civil rights, RICO, and state civil conspiracy cases as well because the purposes of those statutory objectives are equally different than the objectives of antitrust laws. The Fourth Circuit has thus far declined to so hold.

Accordingly, the Court **HOLDS** that the intracorporate conspiracy doctrine applies to conspiracy claims against agents of a corporation brought under the False Claims Act. Thus, unless an exception applies, the Government's conspiracy claims must be dismissed.

### (2)     *Exceptions to the Intracorporate Conspiracy Doctrine*

The Fourth Circuit has recognized two exceptions to the general rule that agents of a principal cannot conspire with one another or the principal: the so-called "independent personal stake" exception, and where the corporate agents are alleged to have acted outside the normal course of their corporate duties -- the "unauthorized acts" exception. *See Hodgin v. Jefferson*, 447 F. Supp. 804, 807 (D. Md. 1978); *Buschi*, 775 F.2d at 1252-53 ("Thus, while authorized acts of the officials would constitute corporate action, (and hence would avoid a conspiracy charge), unauthorized acts would not."); *Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974)

48

("We agree with the general rule but think an exception may be justified when the officer has an independent personal stake in achieving the corporation's illegal objective.").

Initially, the Court notes that the "unauthorized acts" exception is not applicable because the Government did not allege in its Complaint that Defendants acted outside the scope of their employment.  Thus, the only inquiry is whether the "independent personal stake" exception applies.

Under the "independent personal stake" exception, the agent must have a personal interest in the illegal activity "wholly separable" and independent of his relationship with the corporation.  *See Douty v. Irwin Mortgage Corp.*, 70 F. Supp. 2d 626, 633 (E.D. Va. 1999) (quoting *Selman v. Am. Sports Underwriters, Inc.*, 697 F. Supp. 225, 239 (W.D. Va. 1988)); *ePlus*, 313 F.3d at 179-80.  For example, in *Greenville*, the court held that the personal stake exception applied in an antitrust case where an individual defendant, who served as president, director and stockholder of the corporation he was alleged to have conspired with, had a separate affiliation with a competing newspaper, and, due to that affiliation, he would personally benefit from destroying the plaintiff's business.  496 F.2d at 399.  Likewise, in *ePlus*, 313 F.3d at 179-80, the court held the exception applied when an agent stood to gain from the alleged conspiracy, and her personal stake was "wholly separate from her connection to [the principal]" because the purpose of the conspiracy was to send the principal into bankruptcy.

The Fourth Circuit has not decided whether sales commissions earned through sales of a principal-corporation's product are considered a wholly independent personal stake.  However, in *Douty*, the district court held that such a stake was insufficient.  70 F. Supp. 2d at 633 ("According to plaintiff, the individual defendants had a personal stake in the increased commissions available to them after her termination. We find this pleading insufficient because it does not allege that

49

defendants had a stake in her termination independent of their relationship with [the corporation]. To the contrary, any 'personal stake' defendants had in increased commissions was incidental to their employment relationship with [the corporation] because their commissions were determined and paid by [the corporation].").  This analysis is persuasive.[30]  Where a corporation's success is directly dependent on the agent's success in furthering the illegal activity, the two are directly related and are not "wholly independent" of one another.  If one benefits, so will the other.  This was not the case in either *Greenville*, where the individual defendant's separate affiliation with a different company was not related to the success of the company with which he served as president, director, and shareholder, or *ePlus*, where the agent conspired with other employees to siphon money from the principal in order to drive the principal into bankruptcy.  The agent and principal in those cases did not benefit proportionally.

Applying these principles to this case, if Defendants sold more mattresses, both they and Group II profited.  Their success was intertwined and not wholly independent.  The more fraudulent claims that were submitted through the course of their employment with Group II, the more sales commissions Defendants earned.  (*See* Second Am. Compl. ¶ 30.)  Thus, as is the case here, when an agent of a corporation is working within the scope of his employment and acts in a manner that

---

[30]  Given the limited nature of the personal stake exception, the Court is not persuaded by the only case cited by the Government in support of its argument that the exception applies to sales commissions, *United States ex rel. Regan v. Medtronic*, No. 95-1236-MLB, at *12-13 (D. Kan. May 3, 1999) (unpublished).  The district court in that case cited no law in support of its holding, and it is directly opposite of the holding of a court within this circuit, *Douty,* 70 F. Supp. 2d at 633. Further, the Fourth Circuit has declined "to extend the personal stake exception beyond the rationale underlying the *Greenville* decision[]" because further expansion of the exception would threaten to swallow the doctrine.  *Oksanen*, 945 F.2d at 705; *Selman*, 697 F. Supp. at 239.  By accepting the Government's argument, the Court would be doing just that -- extending the exception beyond *Greenville*.

benefits both himself and his corporation for similar reasons, the narrow "independent personal stake" exception is not applicable.

Accordingly, because the intracorporate conspiracy doctrine applies to False Claims Act conspiracies, and because the personal stake exception does not apply, Defendants' motions to dismiss Count III of the Complaint are **GRANTED**.

### III. CONCLUSION

In summary, the Court **ORDERS** that: (1) David Murphy's Motion to Set Aside Default [Docket 112], Motion to Exceed Page Limit for Memorandum of Law in Support of his Motion to Dismiss [Docket 125], and Motion for Leave to File Reply Brief Out of Time [Docket 133] be **GRANTED**; (2) the Motions to Dismiss of Eric Gwinn, David Murphy, and Thomas Binetti, [Dockets 102, 118, & 121], and the Motion for Judgment on the Pleadings of Charlie Gwinn [Docket 119] be **GRANTED IN PART AND DENIED IN PART**; and (3) the Government's Motions for Leave to File Surreplies and a Supplemental Response [Dockets 116, 136, & 164] and Motion to Substitute Page One of Exhibit A to the Second Amended Complaint [Docket 130] be **GRANTED** and those documents be **FILED**.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party. Furthermore, the Court **DIRECTS** the Clerk to publish this decision on the Court's website at http://www.wvsd.uscourts.gov.

ENTER:  March 31, 2008

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

51